**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | |
|---|---|
| SANDRA WRENN, | ) |
| | ) |
|     **Claimant,** | ) |
| | ) |
| v. | )    **CIVIL ACTION NO.** |
| | )    **7:18-CV-00610-KOB** |
| ANDREW SAUL, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
|     **Respondent.** | ) |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On September 19, 2014, the claimant, Sandra Wrenn, applied for a period of disability, disability insurance benefits, and supplemental security income, alleging that she became disabled on April 22, 2014, because of glaucoma, diabetes, back pain, carpal tunnel syndrome, high blood pressure, anxiety, depression, and drowsiness from medication. (R. 39-50, 57-58, 80, 193). The commissioner denied the claimant's claims on December 24, 2014. (R. 101-105). The claimant timely filed a request for a hearing before an Administrative Law Judge , and the ALJ held a video hearing on October 24, 2016. (R. 85-86).

In a decision dated April 18, 2017, the ALJ found that the claimant was not disabled and, therefore, ineligible for the requested benefits. (R. 16-33). On appeal, the Appeals Council denied the claimant's request for review on March 8, 2018. (R. 1-6). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner.

## II. ISSUES PRESENTED

Whether the ALJ's residual functional capacity finding regarding the claimant's vision limitations lacks substantial evidence.[1]

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*" Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence,

---

[1] Although the claimant raised a second issue regarding intellectual disability under Listing 12.05B, the court will reverse only on the RFC issue. However, the court expresses its concerns about the intellectual disability issue at the end of this Memorandum Opinion.

or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding *as long as substantial evidence in the record supports it*.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Pursuant to 20 C.F.R. § 404.1520, an ALJ must follow a five-step sequential process for determining disability. At step four, the ALJ must assess the claimant's residual functional capacity. The RFC is an ALJ's assessment, "based on all the relevant medical and other evidence, of a claimant's remaining ability despite [her] impairment." *Castle v. Colvin*, 557 F. App'x 849, 852 (11th Cir. 2014). In determining the claimant's RFC, the ALJ is required to consider the claimant's descriptions and observations of her limitations resulting from her severe impairments. *See* 20 C.F.R. § 404.1545(a)(3).

To support his RFC determination with substantial evidence, the ALJ must "provide a sufficient rationale to link substantial record evidence to the legal conclusions reached." *Dennison v. Saul*, CA 18-0532-MU, 2019 WL 3468180 *3 (S.D. Ala. July 31, 2019). The ALJ must "link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work." *Packer v.*

*Astrue*, 2013 WL 593497, *4 (S.D. Ala. Feb. 14, 2013), aff'd, 542 F. App'x 890 (11th Cir. Oct. 29, 2013).

## V. FACTS

The claimant was fifty-one-years old with a high school education[2] when the ALJ rendered his decision. (R. 16, 193, 281). The claimant has past relevant work experience as a machine packager and as a fish cleaner, machine tender. (R. 68). The claimant alleged she was disabled beginning April 22, 2014, from glaucoma, diabetes, back pain, carpal tunnel syndrome, high blood pressure, anxiety, depression, and drowsiness from medication. (R. 39-50, 57-58, 80, 193).

### *Physical and Mental Impairments*

On March 25, 2011, the claimant sought treatment at the York Health Clinic for back and wrist pain. The claimant's hand and fingers were swollen from using her hands at work. Dr. Houston diagnosed the claimant with carpal tunnel syndrome. (R. 312, 313).

Dr. Leroy Maxwell at the Eye Max Vision Center treated the claimant on February 27 and March 6, 2014 for blurry vision associated with glaucoma. Dr. Maxwell prescribed Alphagan and Azopt eye drops to treat the increased eye pressure caused by her glaucoma. (R. 328, 334).

The claimant saw Dr. Colie Crutcher on April 24, 2014, at Colie Crutcher, Jr., M.D. & Associates, complaining of lower abdominal and back pain after twisting her back carrying boxes at work. After a physical examination, Dr. Crutcher noted the claimant's lumbosacral spasms. Further, Dr. Crutcher noted that the claimant's neurological examination was within normal limits. (R. 344, 345, 347, 349).

---

[2] The record is unclear if the claimant received a high school diploma or a "certificate" of attendance. (R. 271).

She returned to Dr. Crutcher on May 7 and 21, 2014, both times complaining of back pain. Dr. Crutcher noted that the claimant had back spasms during both physical examinations; that her pain was a little better when she was lying down or slightly bent over; that the claimant was unable to drive and planned to take a leave of absence from work; that she could not keep her shoes on long because of pain; that none of the claimant's medications were working; and that she could not sit down for thirty minutes because of her pain. (R. 345-50).

The claimant went to Keen Health and Wellness Center on June 2, 2014 for back pain. The claimant reported to Nurse Practitioner Terre Moore that on April 22, 2014, while carrying boxes at work, she twisted her back. The claimant explained to NP Moore that Dr. Crutcher gave her two injections for her back pain, and that he ordered an MRI that insurance would not approve. She described her lower back pain at this visit as throbbing, sharp pain that radiated down both legs. During the physical examination, NP Moore indicated that the claimant "jumps when I touch her" back, and that her straight leg raises were positive. (R. 320-21).

NP Moore ordered an MRI of the thoracic spine that revealed mild multilevel degenerative disc changes with a minimal disc bulging at the lower thoracic level, with no focal disc protrusion, cord impingement, or canal stenosis. An MRI of the lumbar spine revealed a small central focal disc protrusion at L5-S1 that mildly deformed the anterior margin of the thecal sac without central canal narrowing or nerve root displacement. The MRI records indicate a mild disc bulging at L4-L5 and mild disc bulging and narrowing of the neural foramina at L3-L4, slightly more on the left. (R. 320, 325, 326).

When the claimant returned to Dr. Crutcher for a follow-up visit on June 18, 2014, he again noted that the claimant had back spasms and had "months of pain." During the July 23, 2014 follow-up, the claimant indicated she was in "a great deal of discomfort." Dr. Crutcher

noted the claimant's back, leg and foot pain, and noted that she had muscle spasms in her back upon physical examination. He noted the claimant's recent MRI that revealed minimal disc bulging and referred her to neurosurgery "ASAP." During the August 25, 2014 follow-up, Dr. Crutcher noted the claimant's continued back pain and spasms and noted "spinal injection approval."

When the claimant returned to Keen Health & Wellness Clinic on July 28, 2014 for a follow-up for her back pain, the doctor noted that the claimant's lower back was tender upon physical examination; that the claimant's back pain persisted but was a "tiny bit better"; and that he was referring her to a neurosurgeon. (R. 328).

At the follow-up visits with Dr. Maxwell on September 4 and 18, 2014, the claimant's vision was blurry even on the prescription eye drops and her glaucoma was "still uncontrolled." Dr. Maxwell noted "progression of advanced glaucoma." (R. 330-334).

On September 24, 2014, Dr. Jason Swanner with the UAB Ophthamology Service Glaucoma Center examined the claimant at Dr. Maxwell's referral and diagnosed the claimant with glaucoma in both of her eyes. Dr. Swanner reported that the claimant had advanced open-angle glaucoma and was on the maximum tolerated medication, including Timolol, Simbrinza, and Travatan. Dr. Swanner indicated that the claimant's "posterior segment examination shows significant optic nerve cupping in both eyes." He recommended dong a SLT laser surgery on her right eye first to see if it would lower her eye pressure and treat her glaucoma. If it was successful, he would do the same procedure on the left eye. If the SLT surgery was not effective, Dr. Swanner recommended trabeculectomy surgery. (R. 519).[3]

---

[3] The record contains no medical records regarding a SLT surgery.

At the request of the Disability Determination Service, the Health Department screened the claimant's vision on October 12, 2014, and she had visual acuity without correction of 20/70 in both eyes and with correction 20/50 in both eyes, indicating visual impairment. (R. 363).

On December 9, 2014 and January 13, 2015, the claimant returned to Dr. Cutcher complaining that she had back spasms and was "hurting all over." She reported that she wakes at night because of her pain and has bilateral leg swelling. At the January 13 visit, Dr. Cutcher noted the claimant's "loss of vision" as an "Additional Problem." (R. 404-405).

During her follow-up visits with Dr. Maxwell on February 19, April 30, and May 4, 2015, the claimant still complained of blurry vision and itchy eyes. Her medications listed to treat her glaucoma included Simbrinza, Timolol, and Travz.

On April 9, 2015, the claimant initially visited Hill Hospital Physicians Clinic complaining of elevated blood pressure, headaches, and back pain. Dr. Paul Marlo examined the patient and diagnosed her with unspecified essential hypertension, lumbago, anemia, glaucoma, and diabetes mellitus without mention of complication. Dr. Marlo prescribed medication for her hypertension. At her follow-up on May 4, 2015, her blood pressure was elevated, but the claimant did not have acute distress. Dr. Marlo continued the claimant on her blood pressure medication. Dr. Marlo's notes also indicate that the claimant "states that she is having eye surgery this month for glaucoma."[4] (R. 416, 419).

When the claimant returned to Dr. Crutcher on May 12, 2015, he noted her back pain, back spasms, and vision loss. He indicated that she could lift 15 pounds occasionally, sit for ten minutes, and stand for thirty minutes. (R. 402).

---

[4] The court can find no records of this eye surgery.

At a follow-up with Dr. Maxwell on August 6, 2015, the claimant continued to have blurry vision even on her medications and complained that the medications were draining into her throat. (R. 408).

The claimant completed a medications list on October 20, 2015 that included Travaton, Leitanoprost, Timolol, and Simbrinza for her glaucoma; Hydrocodone and Naproxen for her back, leg, and feet pain; and Metformin, Lisinupril, and Carvedilol for her diabetes and blood pressure. (R. 265).

The claimant sought treatment at Franklin Primary with Dr. Bernita Mims for diabetes, hypertension, and back pain on November 3, 2015. The claimant said her diabetes was worse and she had blurry vision, burning in her extremities, frequent urination, and increased fatigue. She also indicated that her back pain was worsening and described it as burning, sharp, stabbing, and throbbing pain that radiated to both legs. Bending forward, pulling, pushing, and twisting aggravate her pain; heat, ice, pain medications, and rest help her pain. Dr. Mims gave the claimant a Toradol injection for her pain at this visit. Dr. Mims' diagnoses included chronic hypertension, chronic radiculopathy in her back, chronic "absolute glaucoma" in both eyes, and dysthymic disorder. (R. 490-91).

At the November 3, 2015 visit with Dr. Mims, the claimant also completed a "Patient Health Questionnaire," in which the claimant indicated that nearly every day for the past two weeks she has felt down, depressed or hopeless; had trouble falling and staying asleep or sleeping too much; had a poor appetite or overate; and had trouble concentrating on things. She also indicated that she felt bad about herself more than half the days in the last two weeks. The claimant indicated that these problems did not make it difficult for her to work, take care of

things at home, or get along with people.[5] Dr. Mims diagnosed the claimant with moderately severe depression. (Doc. 91).

Dr. Stephen J. Robidoux examined the claimant on January 26, 2016 at the request of the Disability Determination Service.  The claimant reported that she injured her back on April 22, 2014, while she was loading boxes at work.  Upon physical examination, Dr. Robidoux noted that the claimant had a BMI of 34 indicating obesity and that her vision was 20/40 in both eyes, with glasses.  Upon physical examination, he reported that the claimant was in no acute distress; had a normal, unaided gait; and was oriented to time, place, person, and events.  Further, the claimant's physical and neurological examinations were within normal limits.  Dr. Robidoux rendered clinical impressions of degenerative arthritis, obesity, and lumbosacral strain and found no limitations for her age for sitting, standing, bending, lifting, carrying objects, climbing stairs, using hand and foot controls, handling objects, listening, talking, and travel.  (R. 364-377).

Between January 14, 2016 and October 6, 2016, the claimant followed up with Dr. Maxwell on eight occasions, complaining of blurry vision.  On April 20, 2016, Dr. Maxwell wrote a referral to Dr. Freij and described in detail the claimant's vision impairments.  Dr. Maxwell's findings included that the claimant has "severe optic atrophy and glaucoma"; an "ever increasing loss of vision with corresponding Optic Atrophy, with an associated general muscular fatigue over the last two [years, but] [t]he family did not have sufficient medical coverage until recently"; +2 cataracts; deep peripheral loss in both eyes "corresponding to optic nerve head changes"; "large atrophic appearance" in both eyes; and "decreased amplitude on ERG and VEP."   Dr. Maxwell indicated that he thought that the claimant may have "other systemic

_____

[5]  The court notes that Dr. Mims' notes were typed, and included an "X" by how the claimant apparently answered the questions. Given all the problems noted by the claimant, the court questions whether the claimant understood the question.

neurological involvement" or "optic neuropathy that does not follow that of glaucoma." He suggested an "MRL of the orbit & brain." (R. 534).

Between June 16 and October 6, 2016, the claimant returned to Dr. Maxwell on five occasions, complaining each time that both of her eyes were itchy, watery, and red. At her June 16, 2016 follow-up with Dr. Maxwell, he indicated that the claimant needed more improvement, and on August 11, 2016, he noted that she had an inflamed sclera with mucopurulent discharge. On October 6, 2016, Dr. Maxwell indicated the claimant had advanced glaucoma; that her eye pressure was doing better; but she still needed surgical intervention. (R. 528-533).

On October 5, 2016, Dr. Donald Blanton examined the claimant at the request of her attorney. The claimant reported that she had "back pain, eye problems, high blood pressure, diabetes, nervous trouble, and depression." Further, she stated that she gets "nervous and upset over small things." Dr. Blanton noted that the claimant has glaucoma and "her vision is poor." She told Dr. Blanton that she does not do housework and does not cook, but can make a sandwich; has friends but has no real social life; does go to church; knows how to drive but rarely does so; spends most of her days in home in bed; watches television but does not read; and has a cell phone but cannot text because she cannot see. (R. 515-16).

Upon examination, Dr. Blanton reported that the claimant's mood was "depressed" and that she complained of anxiety. Dr. Blanton reported that the claimant exhibited no confusion; that her affect was flat, but appropriate; that she was oriented to time, place, and person; that she was in pain and restless; that she had no hallucinations, delusions, or paranoia; and that her judgment was adequate for work and financial type decisions. (R. 515)

Dr. Blanton administered the Wechsler Adult Intelligence Scale IV on the claimant, but she "could not see well enough on many close-up subtest to complete all sections of the

intelligence testing." So Dr. Blanton was unable to secure a Full-Scale IQ score because of the claimant's vision impairment. The claimant did obtain a Verbal Comprehension score of 66 and a Working Memory score of 69. Dr. Blanton omitted the Minnesota Multiphasic Personality Inventory because of the claimant's "low intellect and poor reading ability." Dr. Blanton assisted the claimant in reading the Beck Depression Inventory II, and she scored in the moderately depressed range. (R. 516).

Dr. Blanton diagnosed the claimant with anxiety/depressive disorder because of multiple medical problems worsened by chronic pain and with mild intellectual disability. Dr. Blanton determined that the claimant has marked limitations that seriously interfere with her ability to perform work related activities in the following areas: understanding detailed or complex instructions; remembering detailed or complex instructions; responding to usual work pressure; and using judgment to make detailed or complex work-related decisions. He also indicated that the claimant "has functional adaptation problems due to her mental retardation [that] likely manifested prior to age 22 in the following areas: communication, functional academic skills, [and] employment." (R. 516-17)

During a follow-up visit with Dr. Mims on October 12, 2016, Dr. Mims noted the claimant's chronic anxiety, back pain, diabetes, and hypertension. The claimant reported that she has trouble concentrating that caused "somewhat difficulty" in her functioning and that her back pain fluctuates in intensity. Dr. Mims noted the claimant had blurred vision. She also found tenderness in the claimant's spine upon physical examination and gave her a Toradol injection for pain. (R. 521-25).

On October 20, 2016, the claimant returned to Dr. Maxwell, who noted "cc: ou itches, burns." He also noted that the claimant "is improving and looking much better, although [her

eye pressure readings in both eyes] are elevated." Dr. Maxwell indicated that the claimant must "maintain" the Lotemax Gel for her redness, itching, and watery eyes, but to "try to taper it." He also noted "probably a steroid responder." He added a prescription for Latanoprost to try to decrease the claimant's eye pressure in both eyes. (R. 527).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a video hearing before an ALJ on October 24, 2016. (R. 36). The claimant testified that she worked at Foster Farm for five years and hurt her back while operating her box machine. Before working at Foster Farm, she worked at Southern Pride as a machine operator for ten years. (R. 40-42).

When questioned why she could no longer work a full-time job, the claimant stated that she suffers from "pain in my back and my vision." Regarding her vision impairment, the claimant testified that her glaucoma in both eyes is "getting worse." The claimant stated that while she was looking at the screen during the hearing, she can see black, but has a problem with distinguishing color. She also said she can see close up if "it's big, [then] I can read it." She also had a problem judging distance from far off. She cannot text and gets her daughter to do it for her because of her impaired vision. She does not use a computer. (R. 39, 58, 62).

Regarding her back pain, the claimant testified that she has pain every day in her back that feels like "heavy stuff on it" and often hurts so bad she cannot stand or touch her back. On a one to ten scale, the claimant's pain is an eight without pain medication and a six with the medication. She testified that her back pain is "getting worse." The claimant does not have very good balance and has to have help with dressing and bathing.

She testified that she does not cook, shop for groceries, or do laundry; she cannot make the bed, run a vacuum cleaner, take out the garbage, or work in the yard. She drives only once or twice every three months and goes to church once every four months because she cannot sit for long. Dr. Mims treats the claimant monthly for pain, anxiety, high blood pressure, and diabetes.

She can only lift about four to five pounds; stand on her feet for about thirty minutes at a time; walk for about two minutes; and sit in a chair for about thirty to forty minutes at time. She has trouble pushing and pulling with her upper body and pushing with her feet. She has pain in her lower back when she sits and gets out of a chair. She cannot kneel without pain, crouch or squat, crawl on her hands and knees, climb a ladder, rope or scaffold. She suffers from a small disc protrusion at L5 and S1. (R. 40, 42, 46-47, 49-53, 58-60, 64).

The claimant stated that she has carpal tunnel in both of her hands and is unable to hold anything and keeps dropping items. The claimant's operation of machines at work over time caused her carpal tunnel. The claimant has trouble going up and down stairs in her home and has to "grip it on the side, to pull myself up in there." The claimant can reach overhead with her arms, but her hands and fingers are weak because of her carpal tunnel. She cannot ties her shoes or button her clothes. Varying climates aggravate her condition. (R. 42, 45, 51-52, 60, 65).

The claimant suffers from anxiety and depression that she claims comes from "no work, no income, no money, depression." The claimant has bad headaches and noises enhance her headaches; has lost over 30 pounds because of her depression; has a hard time making decisions and dealing with change; gets along with people "okay"; and has trouble with concentration, focus, and memory. About three days out of the week, she is not able to get out of bed to do anything. She does not have a social life, nor does anyone come to see her. She does not have

hobbies, read, complete word puzzles, or go on any trips. The medicines she takes make her very sleepy and drowsy. (R. 43-46, 50, 55, 60-62, 65).

During a normal day, she wakes up at 5:45 am when her kids get up to go to school, and then lies down and watches television in her recliner for about six hours during the day. She only goes outside and gets fresh air when her husband makes her get up. She usually does not eat breakfast, eats lunch around 2:00 pm and dinner around 7:00 pm, and goes to bed around 8:00 pm. (R. 54-55, 66).

A vocational expert, Dr. Steven Gosgrove, testified concerning the type and availability of jobs that the claimant could perform. Dr. Gosgrove stated that the claimant's past work was as a box machine worker and as a fish cleaner, machine tender that are both classified as unskilled positions.

The ALJ proposed a hypothetical scenario to Dr. Gosgrove that asked him to assume a hypothetical individual with the same age, education and past work experience as the claimant, who has light exertional limitations; can occasionally push and pull with her right and left upper and lower extremities; can sit and stand with breaks every thirty minutes as needed; can occasionally stoop, balance, kneel, crouch, and crawl; cannot climb ropes, ladders or scaffolds; must avoid concentrated pulmonary irritants, dangerous moving, unguarded machinery, unprotected heights, and uneven surfaces; needs unskilled work in a low stress environment; can handle no more than simple short instructions and simple work-related decisions with few workplace changes; cannot work in close proximity to others because she would be easily distracted and unable to concentrate, focus, and stay on task; and has occasional near acuity and far acuity, depth perception from vision, and occasional visual limitations. Based on this hypothetical, the vocational expert testified that the claimant could not perform any of her past

work, but that individual could work as a remnant sorter with 510 positions in the State and 30,000 nationwide. (R. 68-71).

In the second hypothetical, the ALJ asked Mr. Gosgrove to assume all of the prior limitations except he changed the visual limitation to someone who had frequent visual acuity. Mr. Gosgrove testified that individual could work as a small product assembler, with 1,000 positions statewide and 29,000 nationwide; an office helper, with 1,300 positions statewide and 74,000 nationwide;  and a mail clerk, with 720 positions statewide and 99,000 nationwide. (R. 72-73).

The ALJ's last hypothetical asked Mr. Gosgrove to assume an individual of the claimant's age, education and past work experience who has sedentary exertional limitation; can only lift and carry four to five pounds; can stand uninterrupted up to thirty minutes; can walk uninterrupted for two minutes; can sit uninterrupted for thirty minutes; can have no upper or lower extremity pushing and pulling on either side; cannot stoop; can occasionally balance but never kneel, crouch and never crawl; can never climb ladders, ropes, or scaffolds; can occasionally handle; must avoid all exposure to extreme cold, heat, wetness, and humidity; must avoid all exposure to pulmonary irritants such as fumes, odors, dust, and gas; must avoid all exposure to hazardous conditions such as unprotected heights, dangerous machinery, and uneven surfaces; can have twelve unplanned absences in a month; is restricted to unskilled work in a low stress environment; cannot work in the close proximity to others because this person would be easily distracted affecting the ability to concentrate, focus, and stay on task; and has occasional visual limitations and occasional near acuity and far acuities.  Mr. Cosgrove testified that this individual could not perform the claimant's past work or any work. (R. 73-74).

Mr. Cosgrove also testified that no jobs were available for an individual who was limited to sedentary work and could only occasionally handle, finger, or feel.  (R. 75).

*The ALJ Decision*

On April 18, 2017, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act.  First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2018 and had not engaged in substantial gainful activity since the alleged onset date of April 22, 2014.  (R. 21).

Next, the ALJ found that the claimant had severe impairments of the spine, carpal tunnel syndrome, anxiety, depression, headaches, hypertension, obesity, and glaucoma.  However, he determined that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16, 21).  The ALJ considered Sections 1.02, 1.04, 2.00, 12.04, and 12.06 in the listing of impairments finding the claimant's impairments did not meet the severity of the clinical criteria set forth in those sections.  (R. 21-22).

He considered her mental impairments under "paragraph B" criteria in Listings 12.04 and 12.06, but found she did not have at least two marked limitations or one extreme limitation in any of the functioning categories.  Instead, the ALJ concluded that the claimant only had moderate limitations understanding remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace.  He also found the claimant had no limitations in adapting or managing herself.  To support his conclusion, the ALJ noted that the claimant's conversations with Dr. Blanton were simple but logic; Dr. Blanton indicated the claimant was not confused, was oriented to time, place and person, and had adequate judgment;

the claimant reported that none of her depressive symptoms made it difficult for her to work or take care of herself; the claimant attends church; the claimant testified at the hearing that she gets along with people; and the claimant had no deficits in memory during an October 12, 2016 visit with Dr. Mims. (R. 22).

Next, the ALJ determined that the claimant has the residual functional capacity to perform light work with the following functional limitations: can occasionally push and pull with the upper and lower extremities, bilaterally; must have a sit/stand option every thirty minutes; can occasionally stoop, balance, kneel, crouch and crawl; can never climb ladders, ropes or scaffolds; can frequently handle; must avoid concentrated exposure to fumes, odors, dust and gas; cannot be exposed to unprotected heights, dangerous machinery, and uneven surfaces; would have one to two unplanned absences in a month; is restricted to unskilled work in a low stress environment; can have no more than simple, short instructions; can make only simple work-related decisions; can have few workplace changes; cannot work in close proximity to others because she would be easily distracted affecting her ability to focus, concentrate, and stay on task; and has frequent visual near acuity. (R. 23).

In making this finding, the ALJ stated that he considered the claimant's symptoms and corresponding medical records. The ALJ found that the claimant's allegations regarding the nature and severity of her impairment-related symptoms and functional limitations were partially consistent with the medical evidence of record. While the allegations regarding the nature of these symptoms were supported within the medical evidence in the file, the ALJ stated that the allegations regarding the severity and restrictions were not entirely consistent with the medical evidence and other evidence in the record. While recounting the claimant's medical record, the ALJ noted that the claimant's neurological examination was within normal limits; the MRI of her

back only showed minimal disc bulging with no nerve infringement; and that the October 20, 2016 notes from Dr. Maxwell showed the claimant's eye condition was improving and "her eyes were looking much better." The ALJ concluded that his RFC assessment was consistent with the appropriate medical findings and the overall evidence in the file. (R. 23-25).

The ALJ gave some weight to the opinion of Dr. Blanton because the claimant's limitations are supported by the findings during the examination. However, although testing revealed that the claimant had moderate depression and mild intellectual disability, the ALJ noted that the claimant never sought mental health treatment; "only receives medications from her treating physician"; and has always worked until physical impairments allegedly prevent her from doing so. (R. 25-26).

The ALJ gave some weight to Dr. Robidoux's opinion that the claimant has no limitations and is capable of medium exertional work. The ALJ found that other evidence in the record supported that the claimant's impairments caused limitations more consistent with his RFC. (R. 26).

Finally, the ALJ found that the claimant was unable to perform any of her past relevant work. In making this determination, the ALJ relied on the testimony of the vocational expert at the ALJ Hearing. Based on the testimony of the vocational expert, the ALJ concluded that the claimant was capable of making a successful adjustment to unskilled, light exertional work that exists in significant numbers in the national economy, such as work as a small product assembler, an office helper, and a mail clerk. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 27-28).

# VI. DISCUSSION

The claimant argues that the ALJ's residual functional capacity finding regarding the plaintiff's visual limitations lacks substantial evidence. This court agrees.

The ALJ's main reason for finding that the claimant has *frequent* near acuity stems from Dr. Maxwell's October 20, 2016 medical record that states that the claimant "is improving and looking much better." The ALJ seemed to take this statement to mean that her glaucoma was improving and much better, and that she was no longer having blurry vision. However, the ALJ's reliance on this one statement to discount the severity of her visual limitations is misplaced.

Dr. Maxwell's October 20, 2016 record did note that the claimant was improving and that she could try to taper her Lotemaz Gel, a corticosteroid used to treat redness, itching, and watery eyes,[6] as a result of that improvement. Dr. Maxwell's reference to an "improvement" seemed to relate to her complaints about the itching and redness in her eyes, (*see* R. 527-533 regarding her complaints at that appointment and prior appointments), and not to an overall improvement in her blurry vision and visual limitations caused by her optic atrophy. Dr. Maxwell also noted that her eye pressure was still elevated, and he actually prescribed an *additional* and *new* medication, Latanoprost, to try to lower her eye pressure.

Moreover, the ALJ ignored Dr. Maxwell's record notes from on October 6, 2016, just a few weeks before, where Dr. Maxwell indicated that the claimant's eye pressure was doing better, but that the claimant *still needed surgical intervention*. The ALJ also seemed to ignore Dr. Maxwell's April 20, 2016 letter to Dr. Freij that indicated that the claimant has "severe optic atrophy and glaucoma" and an "ever increasing loss of vision with corresponding Optic Atrophy,

---

[6] *See* https://www.webmd.com/drugs/2/drug-7319-1522/lotemax-ophthalmic-eye/loteprednol-gel-ophthalmic/details.

with an associated general muscular fatigue over the last two years." Dr. Swanner also indicated in his September 24, 2014 notes that the claimant has "significant optic nerve cupping in both eyes." The court understands that damage to and deterioration of the claimant's optic nerve is irreversible.[7] So, any visual limitations caused by the claimant's severe optic atrophy would still have been present in October 2016. Any "improvement" noted in Dr. Maxwell's October 20, 2016 records did not eliminate the claimant's permanent visual limitations.

The ALJ also seemed to totally disregard the claimant's testimony at the hearing on October 24, 2016, that her vision was "getting worse"; that she has trouble distinguishing colors; that she can see close up if "it's big"; that she has a problem judging distance far off; and that she cannot text on her phone because she cannot see well. Curiously, the ALJ does not mention anywhere in his opinion that the claimant could not complete all sections of the intelligence testing with Dr. Blanton *because of her visual limitations*. (*See* R. 515-517).

The ALJ's RFC finding regarding the claimant's visual limitations did not have a sufficient link to substantial evidence in the record regarding the claimant's permanent optic atrophy and her constant complaints of blurry vision. Despite all of these facts in the medical record, the ALJ found that the claimant had *frequent* near visual acuity[8] and that she could work with *small* products on an assembly line, as an office helper, and as a mail clerk. Each of those jobs would require someone who could see small items up close and who would have to read small print on a frequent basis. Based on the claimant's medical records that show serious visual

---

[7] "Damage to the optic nerve is irreversible because the cable of nerve fibers doesn't have the capacity to regenerate, or heal itself, when damage occurs. This is why glaucoma is an incurable disease as this point, and why early detection is so important." *See* https://www.glaucoma.org/research/optic-nerve-regeneration-1.php
[8] Although having "high acuity" often indicates serious medical need in the general sense, someone with *frequent* near visual acuity would mean someone who would frequently have clarity or clearness of near vision. *See* https://medical-dictionary.thefreedictionary.com/acuity &
https://www.medicinenet.com/script/main/art.asp?articlekey=8241.

problems, the substantial evidence in the record regarding the claimant's visual limitations does not support that finding.

Because substantial evidence in the record does not support the ALJ's RFC finding that the claimant has frequent near visual acuity, the court finds that this action should be reversed and remanded on this issue.

*Other Concerns*

The court is also concerned about whether substantial evidence supports the ALJ's failure to consider Listing 12.05B where the claimant's visual limitations prevented her from obtaining a Full Scale IQ score. The ALJ did not even mention Listing 12.05B presumably because it requires a Full-Scale IQ score. To meet Listing 12.05B, the claimant must show

> 1. Significantly subaverage general intellectual functioning evidenced by a or b:
>
> a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
>
> b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and
>
> 2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>
> a. Understand, remember, or apply information (see 12.00E1); or
> b. Interact with others (see 12.00E2); or
> c. Concentrate, persist, or maintain pace (see 12.00E3); or
> d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive
functioning and about the history of your disorder demonstrates or
supports the conclusion that the disorder began prior to your
attainment of age 22.

20 C.F.R. § Pt. 404, Sub. P, App. 1; *see also Jones v. Berryhill*, No. 4:18-CV-1154-RDP,

2019 WL 3429384, at *4–5 (N.D. Ala. July 30, 2019).

But when one of the claimant's substantial impairments precludes her from obtaining

such a Full-Scale score, the court questions whether special testing should be done to obtain an

Full-Scale IQ score for someone like the claimant with a visual limitation.  With a Verbal

Comprehension Score of 66 and Working Memory Score of 69, the court is concerned about

whether the claimant would have a Full Scale IQ score that would place her within the purview

of Listing 12.05B.

Moreover, the court questions the ALJ's reasons for disregarding Dr. Blanton's opinion

that the claimant has marked limitations in understanding, remembering, or applying information

and concentrating, persisting, and maintaining pace.  To support his finding that the claimant had

only moderate limitations in these two areas, the ALJ noted that the claimant's conversations

with Dr. Blanton were simple but logical; Dr. Blanton indicated the claimant was not confused,

was oriented to time, place and person, and had adequate judgment; and the claimant had no

deficits in memory during an October 12, 2016 visit with Dr. Mims.  But none of these reasons

support that the claimant does not have the marked limitations in these two areas as espoused by

Dr. Blanton.

The fact that the claimant's simple conversation was logical and that she was not

confused does not relate at all to whether the claimant has marked limitations in understanding,

remembering, or applying information and concentrating, persisting, and maintaining pace.

Moreover, the ALJ focused only on the October 12, 2016 medical record from Dr. Mims that

indicated the claimant had normal memory. However, the ALJ did not specifically mention or discuss Dr. Blanton's objective finding *after intelligence testing* that the claimant has a Verbal Comprehension Score of 66 and a Working Memory Score of 69, both of which could indicate marked limitations. And the ALJ himself included in the RFC that the claimant cannot work in close proximity to others because she would be easily distracted, although interestingly the jobs he said she could work seem to be ones where the claimant would work in close proximity with others—on an assembly line, in an office, and in a mail room.

Also, Dr. Blanton indicated that he believed that the claimant's adaptive limitations began before the age of 22. The ALJ did not discuss this finding. The claimant's past work history only included unskilled work, and the record is unclear as to whether she received a high school diploma or a certificate of attendance.

While the claimant has the burden to prove that she is disabled, the ALJ has a corresponding duty to develop a full and fair record. *Vangile v. Comm'r of Soc. Sec.*, 695 F. App'x 510, 512 (11th Cir. 2017) (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003)). On remand, the ALJ should ensure the development of a full and fair record regarding the claimant's vision impairments, including whether the claimant has undergone any eye surgeries and the nature and extent of the claimant's near visual acuity limitations caused by her optic atrophy and glaucoma. The ALJ should also develop a full and fair record regarding the claimant's intellectual disabilities.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the ALJ's RFC finding regarding the claimant's visual limitations lacks substantial evidence. Therefore, this court will REVERSE

and REMAND the Commissioner's decision for the ALJ to determine whether the claimant is entitled to disability consistent with this opinion.

The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 20th September, 2019.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE